UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| VIRGIL C. HAYES, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:08-cv-0938-RLY-TAB |
| | ) | |
| INDIANAPOLIS OSTEOPATHIC | ) | |
| HOSPITAL, INC., d/b/a WESTVIEW | ) | |
| HOSPITAL, | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On July 10, 2008, Virgil Hayes ("Plaintiff"), a former employee of Indianapolis

Osteopathic Hospital, Inc. d/b/a Westview Hospital ("Defendant" or "Westview"), filed a

complaint against Defendant, alleging violations under Title VII of the Civil Rights Act

of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., the Age Discrimination in Employment

Act ("ADEA"), 49 U.S.C. § 623, and breach of contract.  Defendant now moves for

summary judgment.  The court, having read and reviewed the supporting and opposing

briefs, the designated evidence, and being otherwise duly advised, now **GRANTS IN**

**PART** and **DENIES IN PART** Defendant's Motion for Summary Judgment.

**I.      Factual Background**

1.      On February 15, 2006, Plaintiff entered into a written agreement with Defendant to

        work in Defendant's graduate osteopathic medical education rotating internship

        program.  (Deposition of Plaintiff ("Plaintiff Dep.") at 25; Defendant's Ex. 31).

1

2.    At the time Plaintiff entered into the employment contract with Defendant, he was a forty-year-old male, and older than the other interns in his class.  (Plaintiff's Dep. at 99, 134).

3.    Plaintiff's internship with Defendant began on July 1, 2006, and was scheduled to end on June 30, 2007.  (Defendant's Ex. 31).

### A.    Defendant's Non-Harassment Policy and Grievance Procedures

4.    The employment contract contained Defendant's non-harassment policy, which specifies certain behavior that constitutes sexual harassment, including "unwelcome sexual advances, requests for sexual favors . . . or other verbal or physical conduct of a sexual nature by supervisors or others in the workplace." (Defendant's Ex. 5; Plaintiff's Ex. H).

5.    In addition, Defendant's non-harassment policy states that sexual harassment exists when "[t]he conduct has the purpose of or effect of substantially interfering with an individual's work performance, or creating an intimidating, hostile, or offensive work environment."  (Defendant's Ex. 5; Plaintiff's Ex. H).

6.    Pursuant to Defendant's grievance procedures, immediate dismissal is a possible sanction that may be used to discipline an intern.  (Plaintiff's Ex. J; Defendant's Ex. 26).

7.    An intern may appeal the dismissal, or submit a written objection to the dismissal, within thirty days of receiving the sanction.  (*Id*.).

8.    The program director "need not reveal the identity of any person reporting

2

information about possibly sanctionable events."  (*Id*.).

9.      On July 5, 2006, Plaintiff attended an orientation that specifically discussed and

explained Defendant's non-harassment policy.  (Plaintiff Dep. at 19).

### B.      Internship Staff

10.     Dr. Lisa Richter, D.O. ("Dr. Richter"), is a physician at Westview, and the

program director of Defendant's rotating internship.  (Plaintiff's Ex. F, Letter

11/15/06 ("Plaintiff's Ex. F")).

11.     Dr. Eugene Justice, D.O. ("Dr. Justice"), is a physician at Westview, and the Vice

Chief of Staff of Family Practice, and is Director of Medical Education.

(Defendant's Ex. 9 at 4).

12.     Jerry Porter ("Porter") is Chief Executive Officer of Westview.  (*Id*.).

13.     Emily Rogers ("Rogers") is employed by Westview as the Human Resources

Manager.  (Plaintiff's Ex. K, Response to Interrogatories ("Plaintiff's Ex. K") at

1).

14.     Darci Sieracki, A.D.M.E. ("Sieracki"), is employed by Westview as the Physician

Relations Manager/Medical Staff Coordinator.  (Defendant's Ex. 9 at 4).

3

C.   **Plaintiff's Internship and Allegations of Sexual Harassment**

      1.   **July 2006**

15.   Plaintiff's staff evaluation from July 2006 shows that Plaintiff performed below

the expected level of competency, and that Plaintiff's performance was

"substandard for [an] intern."  (Defendant's Ex. 10, Staff Evaluation 7/3/06 -

7/31/06, and Dec. 2006 (one week) ("Defendant's Ex. 10"); Plaintiff's Ex. E, July

3 - 31, 2006 Evaluation ("Plaintiff's Ex. E"); Defendant's Ex. 11, 1st Quarterly

Evaluation ("Defendant's Ex. 11").

      2.   **August 2006**

16.   Dr. Tamara Lyday ("Dr. Lyday") was a female intern employed by Defendant, and

a member of Plaintiff's intern class.  (Plaintiff's Ex. K at 19).

17.   In early August 2006, Dr. Lyday approached Dr. Justus and Dr. Richter because

she felt uncomfortable around Plaintiff, and complained of inappropriate

comments he had made to her.  (Deposition of Dr. Lyday ("Lyday Dep."). at 34-

35).

18.   Dr. Lyday stated that one evening she and Plaintiff went to dinner together.  (*Id*. at

31-34; 60-68).

19.   During dinner, and on the drive home, Plaintiff made inappropriate comments,

such as asking Dr. Lyday if she believed that she had "fucked [Plaintiff] in a

former life."  Plaintiff also told Dr. Lyday that he had "an insatiable sexual

appetite," he masterbated all the time, and that his wife did not "put out."  (*Id*. at

31-32, 60-61).

20. According to Dr. Lyday, Plaintiff also attempted to kiss her.  (*Id*. at 32, 61).

21. Before exiting the car, Dr. Lyday told Plaintiff that she was not interested in him romantically.  (*Id*. at 34).

22. Dr. Lyday's discussion with Dr. Justus and Dr. Richter lasted twenty minutes, and she made it clear that she did not want to bring a formal complaint against Plaintiff, but only wanted to make Dr. Justus and Dr. Richter aware of Plaintiff's behavior.  (*Id*. at 32).

23. On August, 24, 2006, Dr. Justus and Dr. Richter met with Plaintiff to discuss Dr. Lyday's allegations.  Dr. Justus and Dr. Richter told Plaintiff that a complaint had been made by a female employee about inappropriate touching, and that the purpose of the meeting was to discuss how others perceived Plaintiff.  (Plaintiff Dep. at 29).

24. Dr. Richter prepared minutes of the informal meeting to be placed in Plaintiff's file.  Plaintiff was also informed that he did not receive a formal warning. (Defendant's Ex. 18, Informal Meeting Notes 8/24/06 ("Defendant's Ex. 18")).

25. At the meeting, Plaintiff inquired about allegedly inappropriate comments he heard made by female employees in other units, and how those comments related to their "perception."  (Plaintiff Dep. at 57-58).

26. Dr. Justus responded that there was a "double standard," and that Defendant "take[s] care of the females."  (*Id*. at 58).

5

### 3.      October 2006

27.   In October 2006, Plaintiff completed two more rotations, one in surgery and one in emergency medicine.  Dr. Arkush, Plaintiff's surgical advisor, told Plaintiff that his performance was "substandard."  (*Id*. at 40).

28.   On October 30, 2006, Dr. Richter placed Plaintiff on a remediation plan, with the objective of helping "provide [Plaintiff] with a clear plan to work on any deficiencies, skills, or any other items that are addressed."  (Plaintiff Dep. at 40; Defendant's Ex. 16, Remediation Plan 11/1/06 ("Defendant's Ex. 16")).

29.   The remediation plan was not considered a form of probation, but was intended to provide a more focused and structured program for Plaintiff.  (Defendant's Ex. 16).

### 4.      November 2006

30.   On November 15, 2006, Dr. Richter wrote a letter to Plaintiff, informing him that he passed his rotations, and was scheduled to complete the program on the originally anticipated date of June 30, 2007.  (Plaintiff's Ex. F).

31.   On November 28, 2006, Plaintiff attended a postgraduate training committee meeting, in which Dr. Justus, Dr. Richter, Sieracki, and Porter were present. (Plaintiff Dep. at 62).

32.   At the conclusion of the meeting, Plaintiff expressed concern about the written minutes of the August 24, 2006, meeting being placed in his file.  (*Id*.).

33.   Sieracki informed Plaintiff that he could write a letter defending himself, which

would also be placed in the file.  However, Plaintiff never wrote such a letter.  (*Id.* at 58-65).

34.    Following the meeting, Plaintiff continued to meet with Dr. Justus, Dr. Richter, and Porter, and expressed concern that he was not being treated fairly or in the same manner as the other female interns because two female interns were not disciplined for engaging in conduct that Plaintiff felt constituted sexual harassment.  (Justus Dep. at 42; Plaintiff Dep. at 51).

35.    Thereafter, Plaintiff proceeded to make an oral complaint with regard to his witnessing of sexual harassment during an intern training program conducted by Dr. Shiva Golian ("Dr. Golian"), the chief intern.  (Plaintiff Dep. at 51)

36.    According to Plaintiff, while Dr. Golian was giving her report, the projector malfunctioned, and Dr. Justus went to the front of the room to fix the projector. (*Id.*)

37.    As Dr. Justus kneeled down to look at the projector, Dr. Golian and Dr. Lyday started to comment on Dr. Justus's pants saying things such as, "[o]h, look what nice pants," and "I like that material."  (*Id.*; Justus Dep. at 19).

38.    In addition, Plaintiff claimed that Dr. Golian and Dr. Lyday began touching Dr. Justus's pants, rubbing his thighs and legs while cooing and moaning.  (Plaintiff Dep. at 51).

39.    Plaintiff alleges that this event transpired in front of him and a few other medical students.  (*Id.* at 52-53).

40. Besides making his oral complaint, Plaintiff also reminded Dr. Justus of his comment regarding the "double standard," with regard to how sexual harassment was treated between men and women. (*Id*. at 65).

### 5.   December 2006

41. On December 6, 2006, Rogers, Sieracki, and Dr. Richter interviewed Vivan Ko ("Ko"), a medical student who had complained to Sieracki that Plaintiff made her feel uneasy. (Defendant's Ex. 20).

42. Ko reported that while working in one of the medical clinics with Plaintiff, she noticed that after the supervising physician left for the day, Plaintiff would go around the clinic asking staff members if they had neck pain. (Deposition of Emily Rogers ("Rogers Dep.") at 20; Defendant's Ex. 20).

43. Ko reported that Plaintiff would perform Osteopathic Manipulative Therapy ("OMT[1]") or Osteopathic Manipulative Medicine ("OMM[2]") on the staff. (*Id*.).

44. Ko described the OMT treatments used by Plaintiff as different than the methods she had observed or been taught. Ko stated that Plaintiff claimed to have invented his own forms of OMT/OMM, and she described them "more like a massage and caress[,]" than an actual medical procedure. (*Id*.).

45. Ko claimed that she felt uncomfortable when Plaintiff made her observe him

---

[1] OMT is a medical procedure that balances out the musculoskeletal system by contact of the physician with the patient. (Deposition of Eugene Justus ("Justus Dep.") at 67).

[2] OMM is a medial procedure, involving spinal alignment, similar to the type of procedures performed by chiropractors. (Lyday Dep. at 61-62).

performing his "own style" of OMT on other women.  (Rogers Dep. at 19-21; Defendant's Ex. 20).

46.    Ko reported that on one occasion, she showed Plaintiff a picture of her boyfriend. Plaintiff responded by noting that Ko's boyfriend was younger than she, and stated "[w]hen I was 21, I made women scream when we had sex."  (Rogers Dep. 20-21; Defendant's Ex. 20).

47.    Plaintiff made other inappropriate comments to Ko, such as: asking how often she had sex; asking whether she liked younger men; and asking if she liked to "fuck men with beards."  (Rogers Dep. 19-21; Defendant's Ex. 20).

48.    Following the meeting with Ko, Rogers began her investigation of Plaintiff to confirm Ko's allegations.  (Rogers Dep. 30-31).

49.    Rogers contacted various unit managers in the hospital to confirm Ko's claim that Plaintiff was performing OMT on staff and other non-patients.  (Rogers Dep. 31-32).

50.    Rogers received confirmation that Plaintiff was performing OMT on female staff and nurses on three separate hospital units.  (Rogers Dep. 31-33; Defendant's Ex. 20).

51.    In addition, in December 2006, based on the fact that some of the female employees felt uncomfortable by Plaintiff's conduct, the interns cancelled the residence intern Christmas party in order to avoid further contact with Plaintiff. (Lyday Dep. at 66).

### 6.     January 2007

52.     On January 16, 2007, as part of the ongoing investigation of Plaintiff, Rogers and Sieracki interviewed Dr. Lyday.  (Rogers Dep. at 23).

53.     Dr. Lyday told Rogers and Sieracki that since making her informal complaint against Plaintiff in August 2006, the harassment had not stopped.  (*Id*. at 62).

54.     Dr. Lyday stated that on one evening in September 2006, Plaintiff followed her to her car, and she became concerned by his behavior because she was aware that he had a gun.  (*Id*. at 37; Rogers Dep. at 24; Defendant's Ex. 20).

55.     Dr. Lyday also reported another occasion where Plaintiff tried OMT on her, but "made it sexual," by pulling her hair back, and caressing her neck.  After this encounter, Dr. Lyday told Plaintiff that she never wanted him to touch her again. (Lyday Dep. at 62-63; Rogers Dep. at 24).

56.     Despite Dr. Lyday's warning, Plaintiff would come up to her and rub her shoulders and say "[g]osh your muscles are tense, you must not be getting enough sex." (Lyday Dep. at 62-63).

57.     Based on Plaintiff's conduct, Dr. Lyday told a medical assistant that she thought Plaintiff was going to rape her.  (Rogers Dep. at 24; Defendant's Ex. 20).

58.     On January 16, 2007, Rogers and Sieracki interviewed Marta Hajduczyk ("Hajduczyk"), a medical student.  (Rogers Dep. at 24; Defendant's Ex. 20).

59.     Hajduczyk told Rogers and Sieracki that on one occasion, she had requested that Plaintiff demonstrate OMT on her.  (Rogers Dep. at 28).

10

60. While demonstrating the procedure on Hajduczyk, Plaintiff put his hands beneath her clothing and down the front of her pants to her underwear.  (*Id*.).

61. Hajduczyk said that she did not say anything at the time because she did not understand that it was inappropriate until she received further education on the actual procedure.  (*Id*. at 28-29).

62. Hajduczyk claimed that she had observed Plaintiff performing OMT on other women, and that she consciously avoided being in the same room with Plaintiff.  (*Id*. at 29; Defendant's Ex. 20).

63. Plaintiff's final evaluation, which accounted for the time from January 1, 2007 until January 18, 2007, indicated that Plaintiff performed to the expected level of competency, and in some areas, Plaintiff performed at a level that exceeded expectations.  (Defendant's Ex. 15, Staff Evaluation 1/1/07 - 1/18/07 ("Defendant's Ex. 15"); Plaintiff's Ex. D, Jan. 1-18, 2007 Evaluation ("Plaintiff Ex. D.")).

### D.    Plaintiff's Termination

64. On January 16, 2007, Rogers presented the findings of her investigation to Porter, with her recommendation that Plaintiff be terminated.  (*Id*. at 46-47).

65. After reviewing Rogers's investigative report, Porter approached Dr. Justus, and both agreed to terminate Plaintiff because they believed Plaintiff had violated Defendant's sexual harassment policy.  (Justus Dep. at 52).

11

66.   On January 18, 2007, Dr. Justus and Porter met with Plaintiff, and terminated him from the internship program.  Dr. Justus provided Plaintiff a termination letter, which stated that Plaintiff was being terminated "as a result of [Plaintiff's] sexual harassment of multiple females associated with [Defendant]."  (*Id*. at 57; Defendant's Ex. 24, Termination Letter ("Defendant's Ex. 24")).

67.   Plaintiff was aware that Defendant's grievance procedures allowed him thirty days to appeal his termination, but Plaintiff did not elect to initiate an appeal.  (Plaintiff Dep. at 126).

## II.   Summary Judgment Standard

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56 (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson*, 477 U.S. at 248.  In deciding whether genuine issues of material fact exist, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003).

The burden is upon the movant to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the non-moving party may not rest upon the pleadings but "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Becker v. Tenenbaun-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990).

## III. Discussion

### A. Sex and Age Discrimination

Plaintiff alleges that Defendant terminated him based on his sex and age, in violation of Title VII and the ADEA. Title VII forbids an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, under the ADEA, it is "unlawful for an employer . . . to discharge or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). Discrimination violating Title VII and the ADEA can be shown by either the direct or indirect method. In the present case, Plaintiff does not present any direct evidence, and, therefore, the court will employ the indirect method to analyze Plaintiff's discrimination claims.

Under the indirect method, Title VII and ADEA discrimination claims are analyzed under the burden-shifting approach announced in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802-04 (1973).  In order to establish a *prima facie* case of discrimination, a plaintiff must show that: (1) he was a member of a protected class; (2) he was meeting the employer's legitimate job expectations; (3) he was subjected to a materially adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably.[3]  *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008); *Steinhauer v. DeGolier*, 359 F.3d 481, 484 (7th Cir. 2004); *see also Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dept.*, 510 F.3d 681, 687 (7th Cir. 2007); *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 559 (7th Cir. 2007).  If a plaintiff meets his burden of establishing a *prima facie* case of discrimination, the burden of proof shifts to the employer, who "must articulate a legitimate and non-discriminatory reason for the employment action."  *Moser v. Ind. Dept. of Corrections*, 406 F.3d 895, 900-01 (7th Cir. 2005) (citing *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000)).  If the employer meets its burden, the plaintiff must come forward with evidence that shows that the employer's proffered reason is a mere pretext for discrimination.  *Id.* (citing *Stockett*, 221 F.3d at 1001); *see also Peirick*, 510 F.3d at 687.  The ultimate burden, however, always remains with the plaintiff.  *Moser*, 406 F.3d at 901 (citing *Stockett*, 221 F.3d at 1001)).

---

[3] With respect to Plaintiff's sex discrimination claim, in order to establish his *prima facie* case, Plaintiff must show that similarly situated women were treated more favorably. *Steinhauer*, 359 F.3d at 484.  With respect to Plaintiff's age discrimination claim, in order to establish his *prima facie* case, Plaintiff must show that similarly situated employees who were substantially younger were treated more favorably.  *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 475 (7th Cir. 2008) (citing *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885-86 (7th Cir. 2001)).

Defendant concedes that Plaintiff satisfies the first and third element of the indirect analysis because (1) Plaintiff is a male over the age of forty, and, therefore, a member of a protected class based on his gender and age, and (2) Plaintiff was terminated from his employment with Defendant, and, therefore, suffered a materially adverse employment action.  The parties also agree that Plaintiff was substantially older than all of the other interns in his class.  (Plaintiff's Dep. at 99, 134).  However, the parties disagree on whether Plaintiff establishes the second and fourth element.  Therefore, the court limits its analysis of Plaintiff's sex and age discrimination claims to the issues of whether Plaintiff was meeting Defendant's legitimate expectations and if similarly situated and substantially younger women were treated more favorably than Plaintiff.

### 1.    Legitimate Expectations

To determine whether Plaintiff was performing his job in accordance with Defendant's legitimate expectations, "'previous employment history may be relevant and probative in assessing performance at the time of [termination]. . . .'"  *Moser*, 406 F.3d at 901 (quoting *Fortier v. Ameritech Mobile Commc'ns., Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998)).  However, "'its limited utility must also be recognized . . . [c]ertainly early evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken.'"  *Id.* (quoting *Fortier*, 161 F.3d at 1113).  Therefore, the critical inquiry under this analysis is Plaintiff's performance *at the time* of his termination.  *See id*.

Defendant argues that Plaintiff was not performing to Westview's legitimate

15

expectations by relying on a staff evaluation from October 30, 2006, which states that Plaintiff's performance was "substandard." However, the October 30, 2006, staff evaluation is not the most helpful evidence in determining whether Plaintiff was performing to Defendant's expectations at the time of his termination. Rather, to discern Plaintiff's performance at the time of his termination, the most relevant evidence would be his staff evaluation from January 18, 2007, the day of Plaintiff's termination. Although the January 18, 2007, evaluation of Plaintiff is absent of written commentary, all of the scores in each specific area are within the "expected level of competency" range. (Defendant's Exhibit 15). In fact, Plaintiff received some scores indicating that he was "exceeding expectations." (*Id.*). This is evidence that Plaintiff was performing to the legitimate expectations of Defendant at the time of his termination.

Defendant also argues that Plaintiff was not performing to Defendant's legitimate expectations because he was placed in a remediation program. The remediation plan, however, was simply designed to provide a more focused and structured plan for Plaintiff. (Defendant's Ex. 16). Additionally, after Plaintiff was placed on the remediation plan, Dr. Richter informed Plaintiff that he was passing all of his rotations and was still scheduled to graduate from the program on time. (Plaintiff's Ex. E). Therefore, the court finds that a material issue of fact exists as to whether Plaintiff was meeting Defendant's legitimate expectations.

### 2.     Similarly Situated, Substantially Younger Women

Employees are similarly situated if they are directly comparable in all material

16

respects.  *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (citations omitted).  To determine whether employees are similarly situated, "a court must look at all relevant factors, the number of which depends on the context of the case." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000) (citing *Spath v. Hayes Wheels Int'l-In., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000)).  The purpose of identifying similarly situated individuals is to "determine whether there are enough common factors between a plaintiff and a comparator – and a few enough confounding ones – to allow for a meaningful comparison in order to divine whether discrimination was at play." *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 406 (7th Cir. 2007)).  In cases where an employee claims that he was disciplined more harshly by his employer than another similarly situated employee, "'a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct.'"  *Peirick*, 510 F.3d at 688 (quoting *Radue*, 219 F.3d at 617).

        Plaintiff argues that he was not treated as favorably as Dr. Golian and Dr. Lyday because they were not terminated after they engaged in inappropriate conduct with a supervising physician, while Plaintiff was terminated for accusations of sexual harassment.  Plaintiff claims that Dr. Golian's and Dr. Lyday's conduct of rubbing Dr. Justus's pants violated Defendant's sexual harassment policy, and after Plaintiff made an oral complaint about their conduct, Dr. Golian and Dr. Lyday were not disciplined in any manner.  However, even accepting Plaintiff's allegations against Dr. Golian and Dr. Lyday as true, their conduct is not comparable to that of Plaintiff's.  Defendant terminated

Plaintiff based on an investigation which revealed that Plaintiff engaged in sexually

harassing conduct toward multiple women over a seven-month period.  Plaintiff's conduct

caused female employees to avoid interaction with him, which culminated in the

cancellation of the annual intern Christmas party.  By contrast, Dr. Golian and Dr. Lyday

allegedly engaged in a single incident of harassing conduct, which was only reported by

Plaintiff.  Dr. Justus, the alleged victim of Dr. Golian's and Dr. Lyday's conduct, did not

file a complaint against them, nor did any other individual come forward to complain that

he or she felt uncomfortable around Dr. Golian and Dr. Lyday.  Therefore, Plaintiff fails

to show that he was treated less favorably than similarly situated and substantially

younger women because Dr. Golian and Dr. Lyday did not engage in similar conduct.

### 3.    Pretext

Even if Plaintiff could demonstrate that he was treated less favorably than

similarly situated individuals, Plaintiff fails to show that Defendant's reason for

terminating him was pretextual.  The focus of the pretext inquiry is whether an employer

honestly believed its proffered reason for terminating an employee.  *Barricks*, 481 F.3d at

560 (citing *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006)).  In other

words, a court must determine "whether the employer's reason is honest, not whether it is

accurate or wise." *Id.* (citing *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir.

2006)).  A plaintiff will not avoid summary judgment "unless the [plaintiff] puts forth

evidence suggesting that the employer itself did not believe the proffered reasons for

termination." *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 754-55 (7th Cir. 2006) (citing

*Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 397 (7th Cir. 1998)).

Essentially, a plaintiff must show that the employer was lying in order to cover up the

true reason for his termination. *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)

(quoting *Vanasco v. Nat'l-Louis Univ.*, 137 F.3d 962, 962 (7th Cir. 1998)).

Plaintiff alleges that Defendant's reasons for his termination are pretextual because

Defendant did not terminate similarly situated, substantially younger female employees

who were accused of sexual harassment.  However, as discussed in the previous section,

the alleged conduct of Dr. Golian and Dr. Lyday was substantially different from the

alleged conduct of Plaintiff.  More importantly, Plaintiff presents no evidence that

Defendant did not honestly believe Plaintiff sexually harassed multiple female employees.

To the extent Plaintiff claims that he did not engage in sexual harassment or inappropriate

touching, the sole focus of the pretext inquiry is not the truth of the allegations, but

whether Defendant reasonably believed and relied on the allegations when it terminated

Plaintiff.  Absent evidence to the contrary, the court must conclude that Defendant

honestly believed the allegations of sexual harassment against Plaintiff, which led to his

termination.

Plaintiff also argues that pretext exists based on Dr. Justus's alleged statement that

a "double standard" existed for female employees.  However, Plaintiff's argument is

misguided.  Dr. Justus was not the sole decision-maker involved in Plaintiff's termination,

and his alleged comment was made seven months prior to Plaintiff's termination.  These

facts are fatal to Plaintiff's argument because "stray marks that are neither proximate nor

related to the employment decision are insufficient to defeat summary judgment." *Sun v. Bd. of Trustees of Univ. of Ill.*, 473 F.3d 799, 813 (7th Cir. 2007) (citing *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997)).  Therefore, the court finds that Plaintiff has failed to establish his sex and age discrimination claims.  Accordingly, the court **GRANTS** summary judgment on Counts I and II of the Complaint in favor of Defendant.

### B.    Retaliation - Title VII

Plaintiff alleges that Defendant terminated him in retaliation for complaining about the incident between Dr. Golian, Dr. Lyday, and Dr. Justus.  Under Title VII, "[e]mployers are prohibited from punishing employees for complaining about discrimination or other practices that violate Title VII." *Sitar v. Ind. Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (citing 42 U.S.C.A. § 2000e-3(a)).  In a Title VII retaliation claim, "[t]he plaintiff may establish a *prima facie* case of retaliation and overcome defendant's motion for summary judgment using either the direct method or the indirect method." *Sitar*, 344 F.3d at 728.  Plaintiff advances his case using the direct method of proof, which requires him to present direct evidence of "(1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994) (citing *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)).  While the parties agree that the second element is met by Defendant's termination of Plaintiff, the parties disagree as to whether Plaintiff engaged in statutorily protected activity and whether a causal connection exists.

### 1.    Statutorily Protected Activity

In order to show that Plaintiff was engaged in statutorily protected activity, he "must show that []he opposed conduct prohibited by Title VII, or at minimum, that []he had a 'reasonable belief' []he was challenging such conduct." *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997) (citing *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1457-58 (7th Cir. 1994)).  The objective reasonableness of the belief is assessed by examining whether it falls into the category of conduct prohibited by the statute. *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008) (citing *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 706-07 (7th Cir. 2000)). Therefore, in order "to establish the existence of protected expression, a plaintiff must satisfy two elements: that the belief was sincere; and that the belief was reasonable." *Erwin v. Jerome Foods, Inc.*, 1995 WL 115870, at *3 (7th Cir. March 16, 1995) (citing *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989)).

Plaintiff alleges that he believed that he was complaining about sexual harassment when he made his oral complaint about Dr. Golian's and Dr. Lyday's inappropriate touching.  Sexual harassment is recognized as conduct prohibited under Title VII because it is a species of sex discrimination. *Id*. (citing 29 C.F.R. § 1604.11).  However, "sexual harassment is actionable under Title VII only if it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (internal quotation and

citations omitted).  Viewing the facts in the light most favorable to Plaintiff, the record

supports Plaintiff's assertion that his belief was sincere.  However, Plaintiff must also

show that his belief was reasonable.

Plaintiff contends that his belief was reasonable for the same reason he argues that

his belief was sincere.  Defendant, however, argues that Plaintiff could not reasonably

have believed that Dr. Justus's behavior created a hostile work environment, which is

required for establishing a sex discrimination claim under Title VII.  Plaintiff complained

of an isolated incident involving two women touching a supervising physician's pants,

while making sexual innuendos.  This conduct alone is not enough to show a hostile work

environment.  *See Baskerville v. Culligan Intern. Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995)

(holding that occasional vulgar banter, tinged with sexual innuendo, is not sufficient to

establish a sexual harassment claim) (citing *Meritor Savings Bank, FSB v. Vinson*, 477

U.S. 57, 67 (1986)).  In addition, the inappropriate conduct was directed against Dr.

Justus, not Plaintiff.  To maintain an action for sexual harassment, Plaintiff must have

been the subject of the harassing conduct.  *Schobert v. Ill. Dept. of Transp.*, 304 F.3d 725,

733 (7th Cir. 2002) (citing *Ellert v. Univ. of Texas*, 52 F.3d 543, 546 (7th Cir. 1995)).

Therefore, Plaintiff's belief that he was engaged in protected conduct is unreasonable

because he did not complain of conduct that established a hostile work environment, nor

was he the object of any discriminatory conduct.

## 2.    Causal Connection

Even if Plaintiff had engaged in protected activity, Plaintiff's retaliation claim

would ultimately fail because there is no causal connection between his complaint and his termination.  To survive summary judgment, Plaintiff must present sufficient evidence upon which a jury could find a causal connection between his termination and his complaint of perceived sexual harassment.  *See Tai v. Shinseki*, 325 F. App'x 444, 446 (7th Cir. 2009) (citing *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850 (7th Cir. 2008)).  While temporal proximity between the protected activity and the action taken in retaliation for that activity is one consideration in finding a causal connection, the Seventh Circuit has repeatedly stated that "suspicious 'timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim.'" *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010) (quoting *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007)).

Plaintiff's sole argument to show a causal connection is the fact that he was terminated less than two months after complaining of alleged sexual harassment.  This alone is not sufficient to establish a casual connection.  *See Cox v. Pendleton Correctional Facility*, 2009 U.S. Dist. LEXIS 59049, at *19 (S.D. Ind. July 9, 2009) (holding that a one-month period between the plaintiff's complaint of harassment and the plaintiff's termination was insufficient to demonstrate a causal connection, where the temporal proximity was the sole evidence).  Furthermore, as Defendant points out, Plaintiff's termination was supported by an intervening cause because after Plaintiff made his complaint, two other female employees, Ko and Hajduczyk, made complaints about alleged incidents of sexual harassment involving Plaintiff.

Plaintiff does not provide sufficient evidence establishing that his termination was substantially motivated in retaliation for complaining about sexual harassment. Therefore, the court **GRANTS** summary judgment on Count III of the Complaint in favor of Defendant.

### C.    Breach of Contract

In Count IV, Plaintiff brings the state law claim of breach of contract.  Having dismissed Plaintiff's Title VII and ADEA claims, the court must determine whether it should exercise supplemental jurisdiction over Plaintiff's state law claim.  Plaintiff's state law claim falls within a district court's jurisdiction if it is "so related to the [federal] claims in the action within such original jurisdiction that [it] form[s] part of the same case or controversy. . . ."  28 U.S.C. § 1367(a).  In determining whether to exercise supplemental jurisdiction over a remaining state law claim, the district court must "consider and weigh the factors of judicial economy, convenience, fairness and comity. . . ."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

Having considered the relevant factors, the court elects to exercise supplemental jurisdiction and adjudicate the remaining state law claim on the merits pursuant to Section 1367(a).  Plaintiff's remaining breach of contract claim arises out of the same set of facts as his federal claims, and, therefore, the same controversy.  The interests of judicial economy and convenience are served through the court's retention of the remaining state law claim in light of the judicial investment already made by the parties in this action. *See Moses v. Kenosha County*, 826 F.2d 708, 711 (7th Cir. 1987).

The court now turns to the merits of Plaintiff's breach of contract claim.  Plaintiff alleges that Defendant breached the employment contract because Plaintiff was terminated before the term of the contract expired.  Both parties raise the issue of whether Plaintiff was required to exhaust his administrative remedies before seeking judicial review of his breach of contract claim.  The Seventh Circuit addressed this issue in *Qasem v. Kozarek*, 716 F.2d 1172 (7th Cir. 1983).

In *Qasem*, a doctor sued a hospital board for tortious interference of his contract because a hospital board prohibited him from performing certain medical procedures.  *Id.* at 1174.  Pursuant to the hospital's bylaws, any decisions made by the board could be appealed internally.  *Id.* at 1174-75.  After the hospital board decided to prohibit the doctor from performing certain medical procedures, the doctor did not appeal the board's decision within the hospital; rather, he sought judicial review.  *Id.* at 1175.  The Court noted that "in [the] absence of a statute requiring exhaustion prior to judicial review . . . whether to require exhaustion is within the discretion of the trial court rather than mandatory."  *Id.*  The Court held that the district court did not abuse its discretion by not requiring the doctor to exhaust his administrative remedies before seeking judicial review because the only remedy the doctor sought was an award of monetary damages, not reinstatement.  *Id.*  The Court reasoned that since the hospital board was not empowered to award the doctor damages, it was unnecessary to require him to pursue his administrative remedies.  *Id.*

In the instant case, Plaintiff seeks both monetary damages and reinstatement for

25

Defendant's alleged breach of contract.  Plaintiff argues that *Qasem* does not require him to exhaust his administrative remedies before seeking judicial review of his monetary damages claim.  Plaintiff further argues that the Court's holding should be extended to circumvent pursuing administrative remedies with respect to his equitable claim of reinstatement.  However, the *Qasem* Court directly spoke to this issue by specifically noting that because the doctor sought solely monetary damages, he did not have to pursue administrative remedies.  *Id*.  The reasoning behind the holding was that monetary damages could not be awarded by the hospital board, whereas, the board had discretion to provide equitable relief such as reinstatement.  *Id*.  Therefore, the court finds that any equitable claim for relief requires exhaustion of administrative remedies.

Applying the holding of *Qasem* to the instant case, Plaintiff's breach of contract claim survives summary judgment to the extent that he seeks monetary damages. However, summary judgment is appropriate on the issue of reinstatement because he was required to exhaust his administrative remedies before seeking judicial review.[4] Accordingly, the court **GRANTS IN PART** and **DENIS IN PART** summary judgment on Count IV of Plaintiff's Complaint.

**IV.    Conclusion**

For the reasons set forth above, the court hereby **GRANTS IN PART** and

---

[4] Plaintiff's argument that exhaustion is not required because reinstatement is also an available remedy under Title VII and the ADEA is moot because the court granted summary judgment on Plaintiff's Title VII and ADEA claims.

26

**DENIES IN PART** Defendant's Motion for Summary Judgment (Docket # 67).  The sole

remaining issue is Plaintiff's breach of contract claim, to the extent he seeks monetary

damages.


**SO ORDERED** this 19th day of July 2010.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic Copies To:

John H. Haskin
HASKIN LAUTER  & LARUE
jhaskin@hlllaw.com

Jay  Meisenhelder
HASKIN LAUTER  & LARUE
jmeisenhelder@hlllaw.com

John S. Mercer
WOOD TUOHY GLEASON MERCER & HERRIN
jsmercer@indylegal.com

Bradley L. Wilson
HASKIN LAUTER  & LARUE
bwilson@hlllaw.com